# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS FOX,                        )
                                   )
       Plaintiff,         )        Civil Action No. 10-192 Erie
                                   )
   v.                              )
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
       Defendant.         )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

### I.    INTRODUCTION

Thomas Fox ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.* Plaintiff filed his application on June 26, 2006, alleging disability since June 10, 2001 due to reactive airways dysfunction syndrome ("RADS"), reactive upper airways dysfunction syndrome ("RUDS"), carpal tunnel syndrome, impaired hearing, impaired vision, and high blood pressure[1] (AR 83-88; 102).[2] His application was denied (AR 68-71), and following a hearing held before an administrative law judge ("ALJ") on August 6, 2008 (AR 27-53), the ALJ found that Plaintiff was not entitled to a period of disability or DIB under the Act (AR 61-67). Plaintiff's request for review by the Appeals Council was denied (AR 4-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are the parties' cross-motions

---

[1] Plaintiff only challenges the ALJ's decision with respect to his pulmonary impairments; therefore, I confine my discussion accordingly.
[2] References to the administrative record [ECF No. 4], will be designated by citation "(AR __)".

1

for summary judgment. For the reasons that follow, Plaintiff's motion will be denied and the Commissioner's motion will be granted.

## II. BACKGROUND

Plaintiff was 63 years old on the date of the ALJ's decision and has a college education with past relevant work experience as a computer software engineer (AR 33; 103). Prior to Plaintiff's alleged onset date, Robert G. Sioss, M.D., the medical director of Lucent Technologies where Plaintiff was employed, issued a letter dated November 20, 1998 stating that Plaintiff had hypersensitivity to certain odors and fumes resulting in marked sinus pressure and headaches (AR 144). Dr. Sioss indicated that persons wearing colognes or perfumes could trigger a reaction, and Plaintiff was instructed to ask those sharing his work space to refrain from using such products (AR 144). On March 22, 2000, Plaintiff was seen by John Oppenheimer, M.D. of Pulmonary and Allergy Associates, P.A., who reported that Plaintiff was seen in his office "with severe irritant response in the upper airway to fragrances" (R 152). Dr. Oppenheimer recommended that whenever possible Plaintiff be accommodated in order to avoid such exposures, since they "provide[d] him with a great deal of discomfort and prolonged agony thereafter" (AR 152).

Plaintiff was seen by Sam T. Bebawy, a pulmonologist, on May 22, 2001 and complained of shortness of breath (AR 163). Plaintiff reported that he suffered a reaction when exposed to any fumes or perfumes (AR 163). Dr. Bebawy diagnosed him with hyperactive airway and hypertension, and prescribed Albuterol (AR 163).

On December 13, 2001, Plaintiff underwent pulmonary function testing which yielded normal results (AR 159-160).

On May 23, 2002, Dr. Oppenheimer stated that Plaintiff suffered from sensitivity to fragrances that caused him to have respiratory reactions, inflamed sinuses and elevated blood pressure (AR 151). Dr. Oppenheimer requested that Plaintiff be accommodated by "re-seating him if needed to avoid strong odors/fragrances" and by allowing him to "wear a face mask" (AR 151). Pulmonary functions tests dated May 23, 2002 and May 29, 2002 were reported as normal (AR 155-158).

2

On June 3, 2003, Dr. Oppenheimer wrote a note requesting that Plaintiff be excused from jury duty due to chronic rhinitis, which worsened following exposure to strong odors (AR 150).

Plaintiff began treatment with Timothy Callaghan, M.D., on September 14, 2005 (AR 193). Dr. Callaghan noted a history of chronic exposure to mineral wool and linseed oil resulting in "injury to and dysfunction of multiple organs and systems" (AR 194). Plaintiff reported that fragrances were "the worst" but he could work in a "clean environment" (AR 193).

On October 13, 2005, Plaintiff was seen by Gregory Palega, M.D. for a comprehensive medical evaluation (AR 175-176). Plaintiff reported that he suffered from hypertension that spiked when he had "chemical sensitivity reactions" (AR 176). Dr. Palega noted that Plaintiff was being treated by a pulmonologist, and had a "well-documented" history of chemical sensitivity with dyspnea acutely associated with chest pain and pressure, and had "severe fragrance reactions" (AR 176-177). No abnormalities were noted in his laboratory results (AR 180-181). On physical examination, Dr. Palega found normal breath sounds bilaterally, normal excursion and no evidence of rales or wheezing (AR 176). He diagnosed Plaintiff with hypertension, retinal surgery and vitreous detachment, and "reactive airways" (AR 175). He recommended that Plaintiff taper off the beta blocker and continue Albuterol aggressively as needed (AR 175).

Plaintiff returned to Dr. Callaghan on January 20, 2006 and reported that he had not started recommended treatment due to money concerns (AR 187). He indicated that he had a reaction to cleaning products in restrooms, but did "well" most days unless he was exposed to chemicals (AR 187). He claimed he was unable to work due to sensitivities to workplace fragrances and chemicals, which caused chest tightness and increased blood pressure (AR 187).

On March 1, 2006, Dr. Callaghan noted that when "not exposed" Plaintiff's pulmonary function was normal (AR 186). It was further noted that Plaintiff had not worked for five years, that he had used up his 401(k) and was accumulating debt and needed a Social Security disability report (AR 186). Dr. Callaghan noted that Plaintiff was in no distress in his "clean" office and

3

his voice was "ok" (AR 186). On the office visits of April 13, 2006 and May 18, 2006, no physical complaints were noted (184-185).

When seen by Dr. Palega on March 9, 2006, Plaintiff reported that he had discontinued Albuterol without any symptoms or consequences (AR 173). He was diagnosed with hypertension, chemical sensitivities and "reactive airways" (AR 173).

Plaintiff was seen by Brian Gilmore, M.D., from Coastal Pulmonary Medicine on June 12, 2006 (AR 210). Dr. Gilmore noted that Plaintiff's condition was unchanged since his last visit in February 2006 (AR 210). He reported Plaintiff was "doing well" and that he had not tried the Advair, but continued to follow "avoidance measures" (AR 210). On physical examination, Dr. Gilmore found Plaintiff's lungs were clear with good air movement (AR 210). He diagnosed Plaintiff with RADS/irritant induced asthma, but that noted that he was asymptomatic and stable without the need for Advair (AR 210). Dr. Gilmore recommended Plaintiff continue avoidance measures and try Advair if needed (AR 210).

Plaintiff returned to Dr. Callaghan on July 19, 2006, and reported that he recently had a "queasy feeling" when encountering an individual wearing cologne at an art gallery (AR 183). He further reported that walking on blacktop surfaces triggered the same symptoms (AR 183). Plaintiff stated that he was "struggling with how to live and be able to leave the protective bubble of his house" without suffering a reaction (AR 183). Dr. Callaghan recommended that Plaintiff eat well, engage in positive thinking and avoid exposures (AR 183).

Dr. Callaghan prepared a medical report dated August 22, 2006 (195-198). In this report, he recounted Plaintiff's medical history, noting that he had a history of reactions to fragrances and chemicals at work that caused severe hypertension, chest pain, dizziness and sinus pressure (AR 196). Dr. Callaghan further noted that EMS had transported him twice; once to his pulmonologist's office and once to the emergency room (AR 196-197). Dr. Callaghan concluded his report by observing:

> Mr. Fox is an unfortunate victim of multiple chemical exposures that exacerbated his initial mild allergies/chemical sensitivities and have curtailed his quality of life significantly and routinely rendered him a "prisoner" in his own home, fearful to venture out and wondering what the next "trigger" will be. He is totally unable

4

> to work since most of the common work place chemicals like fragrances, copy
> machine off gassing, cleaning products, air freshener products can trigger a rapid
> pulmonary decline necessitating medicine and possibly … an emergency room
> visit.
>
> . . .
>
> He will require a clean and safe environment to prevent episodes of respiratory
> distress. His own home will probably be the only place he can be secure in, with
> the periodic travels for food and necessities. …

(AR 198).

On September 19, 2006, Joseph Gonzalez, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could perform light work with some push/pull limitations in his upper extremities and some postural limitations (AR 201-202). With regard to environmental limitations, Dr. Gonzalez found Plaintiff should avoid concentrated exposure to noise and avoid moderate exposure to fumes, odors, dusts, gases, and poor ventilation (AR 203).

Plaintiff returned to Dr. Gilmore on October 16, 2006 and reported that his breathing was stable over the summer and he had not needed "active treatment" such as Albuterol or Advair (AR 208). Dr. Gilmore noted no change in his exercise tolerance, active bronchospastic symptoms, chest pain or cough (AR 208). Plaintiff stated that his problems were primarily "chemical sensitivities" (AR 208). Plaintiff was in no distress on physical examination, and his lungs were clear with quiet respiration (AR 208). Dr. Gilmore noted there was some very minimal end-expiratory wheeze upon forced expiration only (AR 208). He was diagnosed with RADS/irritant induce asthma, and Dr. Gilmore recommended that he continue avoidance measures, and take Albuterol and Advair as needed (AR 208).

On October 19, 2006, Plaintiff was seen by Dr. Palega, who noted that Plaintiff's hypertension was controlled with medication and his pulmonary symptoms were stable (AR 212). Plaintiff denied palpitations, presyncope or syncope, nausea, dyspnea, ankle edema, orthopnea and nocturnal dyspnea (AR 212). Dr. Palega found Plaintiff looked healthy and was in no distress, and exhibited normal breathing effort, normal breath sounds bilaterally, normal

excursion, and no rales or wheezing (AR 212). A chest x-ray dated October 19, 2006 revealed no active disease, and an EKG was unremarkable (AR 215-216).

On October 22, 2006, Charles Fitts, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could perform light work as previously found by Dr. Gonzalez (AR 219-220). Like Dr. Gonzalez, he concluded that Plaintiff should avoid moderate exposure to fumes, odors, dusts, gases and poor ventilation (AR 223). Dr. Fitts examined the medical evidence submitted following Dr. Gonzalez's assessment dated September 19, 2006, and acknowledged Dr. Callaghan's opinion that Plaintiff was totally unable to work (AR 221). He noted however, that while Plaintiff had long history of allergies to multiple chemicals and "fragrances," no specific allergens were identified in the medical record other than Plaintiff's described reactions (AR 221). He further noted that his condition had not required multiple "severe" emergency room visits and he had no history of anaphylaxis (AR 221). Accordingly, Dr. Fitts concluded that Dr. Callaghan's opinion was unsupported by the medical evidence of record (AR 225).

Plaintiff returned to Dr. Gilmore on January 18, 2007 "primarily to discuss other testing with plans to pursue disability" and was interested in the methacholine challenge test[3] (AR 230). Dr. Gilmore noted that Plaintiff reported being "ill" recently in poorly ventilated areas, but presently had no active respiratory symptomatology (AR 230). Dr. Gilmore found that Plaintiff was in no acute distress, his lungs were clear bilaterally and there was no change with forced expiration (AR 230). A pulmonary function test dated January 18, 2007 was essentially normal without evidence of significant obstructive lung disease (AR 230-231). Dr. Gilmore diagnosed Plaintiff with RADS/irritant-induced asthma, and noted that Plaintiff was to contact him if he wished to pursue methacholine challenge testing (AR 230). Otherwise, Plaintiff was to continue to avoid exacerbants and use Albuterol as needed (AR 230).

Plaintiff underwent a methacholine challenge test on April 3, 2007 which showed no evidence of airway hyperreactivity (AR 229).

---

[3] A methacholine challenge test is used to assist in the diagnosis of asthma. *See* http://encyclopedia.thefreedictionary.com/Methacholine+challenge+test.

On February 4, 2008, Plaintiff was seen by Dr. Gilmore and reported recurrent difficulties upon exposure to heat, unventilated spaces and crowds (AR 229). He claimed to suffer from chest tightness, dyspnea and diaphoresis, but denied wheezing (AR 229). He indicated that his symptoms resolved upon getting out of the "problematic environment" and moving to ventilated spaces (AR 229). Plaintiff was in no distress on physical examination, and Dr. Gilmore reported that his lungs were clear, there was fair movement bilaterally, there was no change with forced expiration and there was no dullness (AR 229). He was diagnosed with RADS/irritant-induced asthma, but Dr. Gilmore noted that while Plaintiff clinically had a history consistent with that diagnosis, "it [had] remained difficult to provide definitive objective testing in this regard" (AR 229). Dr. Gilmore further stated that he would "continue to support his claim and condition" (AR 229). Plaintiff requested a "letter of accommodation" allowing him to avoid problematic environments and obtain more immediate help should he develop difficulties (AR 229). He was to continue Albuterol as needed (AR 229).

On February 5, 2008, Dr. Gilmore authored a letter requesting accommodations for Plaintiff, stating that he should avoid poorly ventilated environments, crowds, warm weather, poor air quality and "other nonspecific respiratory irritants" which could exacerbate his respiratory symptoms (AR 228).

Plaintiff and William Reed, a vocational expert, testified at the hearing held by the ALJ on August 6, 2008 (AR 27-53). Plaintiff testified that he was single and lived with his mother (AR 32). He stated that he developed chemical sensitivities in 1990 as a result of working in a building with improperly installed fireproofing materials (AR 35-36). He claimed that his employer accommodated his sensitivities by placing him in an office with an office mate that did not wear fragrances (AR 35-36). Plaintiff testified that in 2001, his employer's medical director recommended that he work from home following "two ambulance rides," but his supervisor "scoffed" at his request (AR 36). Plaintiff stated that he was terminated from his job in 2001 due to downsizing and had not worked since (AR 34). He acknowledged however, that he could perform his previous job if his employer provided him with accommodations (AR 35-36).

7

Plaintiff testified that hot asphalt caused him to have trouble breathing, in that he suffered burning in his upper chest and swelling in his lower back lasting for several hours (AR 38; 42). He claimed that he experienced these asphalt episodes approximately 100 times per year (AR 43-44). Plaintiff also stated that fragrances caused a "burn" and "inflammation" of his sinuses which at times caused an inability to sleep if he experienced a "really bad" reaction (AR 41-42). He also suffered reactions to other irritants, including some carpets, and had trouble with humidity and unventilated spaces (AR 44; 47).

Plaintiff testified that while living in South Carolina, he was able to bike, walk and garden, and had built a coffee table and dining table (AR 42-43). He claimed that he was fine in "good air" (AR 43). He testified that he moved back to the area, performed caregiver duties for his mother, and was involved in supporting the local arts and music scene (AR 45).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was limited to light work that did not involve any extremes of dust, fumes, chemicals or temperature (AR 49). Such individual would further not be able to work in any unventilated spaces, around crowds or be exposed to extremes of oil products such as fragrances or asphalt (AR 49-50). The vocational expert testified that such an individual could perform his past relevant work as a software engineer (AR 50).

Following the hearing, the ALJ issued a written decision finding Plaintiff was not entitled to a period of disability or DIB within the meaning of the Act (AR 61-67). His request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 4-6). He subsequently filed this action.

### III.  STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala,* 55 F.3d 900, 901 (3rd Cir. 1995). It has

been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3rd Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3rd Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

## IV. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). In order to be entitled to DIB under Title II, a claimant must additionally establish that her disability existed before the expiration of her insured status. 42 U.S.C. § 423(a), (c); *Matullo v. Bowen*, 926 F.2d 240, 244 (3rd Cir. 1990) (claimant is required to establish that he became disabled prior to expiration of his insured status); *see also* 20 C.F.R. § 404.131. The ALJ found that Plaintiff met the disability insured status requirements of the Act through December 31, 2006 (AR 61). Therefore, Plaintiff must show that he was disabled on or prior to that date for purposes of entitlement to disability insurance.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id*. If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ concluded that Plaintiff met the insured status requirements of the Act through December 31, 2006, and that he had not engaged in substantial gainful activity since June 10, 2001, his alleged disability onset date (AR 63). The ALJ further found that his reactive airways disease was a severe impairment, but determined at step three that he did not meet a listing (AR 63). The ALJ found that he was able to perform light work, except that he could not work in environments with extremes of dust, fumes, chemicals, or temperatures; no extremes of oil products such as asphalt or strong fragrances; and no work in unventilated environments or crowds (AR 64). The ALJ concluded that his past relevant work as a computer software engineer did not require the performance of work-related activities that were precluded by the above limitations (AR 66). In addition, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible (AR 64). Again, I must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff challenges the ALJ's residual functional capacity ("RFC") assessment relative to his environmental limitations. "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin*. 220 F.3d 112, 121 (3rd Cir. 2000) (quoting *Hartranft v. Apfel*, 181

F.3d 358, 359 n.1 (3rd Cir. 1999)); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. *See* 20 C.F.R. § 404.1546. In making this determination, the ALJ must consider all evidence before him, *see Burnett*, 220 F.3d at 121, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of the evidence. *See* Social Security Ruling ("*SSR*") 96-5p, 1996 WL 374183 at *5.

Plaintiff first argues that the ALJ improperly afforded Dr. Callaghan's opinion little weight. Dr. Callaghan opined on August 22, 2006 that Plaintiff was totally unable to work and was essentially a "prisoner" in his own home (AR 198). As noted above, in making an RFC determination, the ALJ is required to consider and weigh all of the medical records provided concerning a claimant's impairments. When the information is provided by a treating physician, "[a] cardinal principle … is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3rd Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3rd Cir. 1999)) (citations omitted); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3rd Cir. 1994). As such, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3rd Cir. 1993). A treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Halter*, 247 F.3d 34, 43 (3rd Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). In choosing to reject a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to

his own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988) (holding that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence" not "simply by having the administrative law judge make a different judgment"); *Moffat v. Astrue*, 2010 WL 3896444 at *6 (W.D.Pa. 2010) ("It is axiomatic that the Commissioner cannot reject the opinion of a treating physician without specifically referring to contradictory medical evidence."). Finally, where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

The ALJ declined to accord Dr. Callaghan's opinion controlling weight since it was based upon Plaintiff's subjective complaints and self-reported history, rather than objective findings on examination and testing (AR 65). The ALJ noted that pulmonary function testing performed on December 13, 2001, May 23, 2002 and May 29, 2007 were all reported as normal (AR 65; 155-160), and chest x-rays dated October 19, 2006 showed "no active disease" (AR 65; 215-216). In addition, on the six occasions Plaintiff was seen by Dr. Callaghan, treatment notes reveal the absence of *any* physical examinations performed by Dr. Callaghan (AR 183-194). Only one treatment note entry, dated March 1, 2006, objectively speaks to Plaintiff's physical condition, wherein Dr. Callaghan noted that Plaintiff was in no distress in his "clean" office and his voice was "ok" (AR 186).

Plaintiff also argues that Dr. Callaghan's opinion supports an "extreme sensitivity" to airborne irritants and that the ALJ erred in failing to conclude that he suffered from this limitation. *See* [ECF No. 8] Plaintiff's Brief pp. 12-14; 17. The ALJ, however, found no support for an "extreme sensitivity" to airborne irritants based upon the treatment records of Plaintiff's own treating pulmonary specialists, Drs. Oppenheimer and Gilmore, and his family physician, Dr. Palega (AR 65). The ALJ observed that treatment records from Dr. Oppenheimer, Dr. Gilmore and Dr. Palega showed Plaintiff's symptoms were well controlled with medication, and he was essentially asymptomatic, so long as he avoided exposure to irritants such as extremes of

dust, fumes, chemicals or temperatures; extremes of oil products such as asphalt or strong fragrances; and unventilated environments or crowds (AR 65).

In this regard, the treatment records from Plaintiff's treating physicians show that between October 2005 and February 2008, no abnormalities were revealed on physical examination, with Plaintiff consistently exhibiting normal breath sounds bilaterally, normal excursion, and no rales or wheezing (AR 65; 176; 208; 210; 212; 229-230). In addition, throughout 2006, Dr. Gilmore stated that Plaintiff's condition remained unchanged and that he was "doing well," had not used Advair, and did not feel he "needed active treatment" (AR 208-210). Dr. Palega noted in March 2006 that Plaintiff had discontinued his Albuterol without any symptoms or consequences (AR 173), and Dr. Gilmore's treatment notes for 2007 and 2008 showed no active respiratory symptomatology (AR 229-230). Dr. Oppenheimer opined that Plaintiff should avoid "**strong** odors/fragrances" and that his symptoms worsened following exposure to "**strong** odors" (AR 150-151) (emphasis added). Dr. Gilmore opined that Plaintiff should avoid poorly ventilated environments, crowds, warm weather, poor air quality and "other nonspecific respiratory irritants" (AR 228). In sum, the ALJ's decision reflects that he articulated an adequate basis for assigning "little weight" to the opinion of Dr. Callaghan and his findings with respect to this opinion are supported by substantial evidence.

Plaintiff next challenges the ALJ's credibility determination. An ALJ must consider subjective complaints by a claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1529(a). Such other evidence includes the claimant's own statements, the claimant's daily activities, the treatment and medication the claimant has received, any statements by treating and examining physicians or psychologists, and any other relevant evidence in the case record. *See* 20 C.R.R. § 404.1529(c); *SSR* 96-7p, 1996 WL 374186 at *2. The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *See Baerga v. Richardson*, 500 F.2d 309, 312 (3rd Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his

13

determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3rd Cir. 1983).

The ALJ found Plaintiff's statements concerning his claimed limitations were not entirely credible based upon the medical evidence, opinion evidence and Plaintiff's own statements with respect to his activities (AR 64-66). The ALJ noted that he was able to engage in a wide range of activities that were inconsistent with Plaintiff's claims of total disability, such as caring for his elderly mother, attending to his personal needs, performing household chores, preparing meals, and shopping and driving (AR 66). The ALJ further noted that Plaintiff testified that he was able to walk and bike long distances, liked being out in the fresh air, and remained active in local arts and music (AR 66). Plaintiff argues that the ALJ misrepresented his self-described activities, ignoring the fact that he could only perform these activities in "clean air" and that his home was free of "all environmental and chemical triggers." *See* [ECF No. 8] Plaintiff's Brief pp. 20-21. However, Plaintiff also reported that he was able to spend time with friends four times per week, and regularly visited the library, coffee shop and local park (AR 111; 115). Thus, as pointed out by the Commissioner, Plaintiff was able to participate in other activities wherein he could reasonably be expected to be exposed to a "variety of environments of varying air quality." [ECF No. 10] Defendant's Brief p. 22. I conclude that the ALJ's credibility determination is supported by substantial evidence.

I also reject Plaintiff's contention that the ALJ's credibility analysis was further deficient because he failed to consider his "long and industrious work record" in assessing his credibility. *See* [ECF No. 8] Plaintiff's Brief pp. 22-24. Plaintiff relies on *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3rd Cir. 1979), which held that the plaintiff's testimony as to his capabilities was entitled to substantial credibility based on his long work history and the fact that it was supported by the medical evidence. *See also Tabron v. Harris*, 667 F.2d 412, 413 (3rd Cir. 1981) (plaintiff worked steadily after his accident, underwent surgery and spent 10 weeks in the hospital but was eventually forced to quit due to pain); *Rieder v. Apfel*, 115 F. Supp. 2d 496, 505 (M.D.Pa. 2000) (plaintiff worked steadily after high school and attempted to work even after she began to experience cognitive dysfunction, seizure disorder, anxiety and depression); *Sidberry v. Bowen*,

14

662 F. Supp. 1037-38 (E.D.Pa. 1986) (although plaintiff was hospitalized 18 times, she continued to work for 12 years after the onset of her condition). Here however, Plaintiff did not attempt to work after his alleged onset date; a factor clearly distinguishable from the above cited cases. *See Corley v. Barnhart*, 102 Fed. Appx. 752, 755 (3rd Cir. 2004) (refusing to remand a case based upon the ALJ's failure to have commented on the claimant's work history, noting that in cases that were remanded "the claimant not only had a long and productive work history, but also showed evidence of severe impairments or attempted to return to work, and neither of these circumstances exist here").[4]

Plaintiff's final argument is that the ALJ's hypothetical question to the vocational expert was flawed because it did not include all the limitations as found by Dr. Callaghan. An ALJ's hypothetical to a vocational expert must reflect all of the claimant's impairments and limitations supported by the medical evidence. *See Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3rd Cir. 1987). As discussed above, the ALJ was justified in affording Dr. Callaghan's opinion little weight in assessing his RFC. Consequently, the ALJ did not err in failing to incorporate his limitations into the hypothetical proposed to the vocational expert.

## V.     CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment will be denied and Defendant's motion for summary judgment will be granted. An appropriate Order follows.

---

[4] In point of fact, the ALJ did consider Plaintiff's long work history, but observed that Plaintiff had been discharged by his employer in part for poor performance unrelated to any medical impairment (AR 65).

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS FOX, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 10-192 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **ORDER**

AND NOW, this 2nd day of September, 2011, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [ECF. No. 7] is DENIED, and Defendant's Motion for Summary Judgment [ECF No. 9] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Thomas Fox.

The clerk is directed to mark the case closed.


                                                                                s/ Sean J. McLaughlin
                                                                                  United States District Judge


cm:    All parties of record